McKINSTER, Acting P. J.
*915 I. INTRODUCTION
Defendant Brian Keith Koback walked into a rental car company office and stole a set of car keys. When confronted by three employees in the parking lot, defendant told the men to back off or he would "fuck" them up. He then walked across the street. Undeterred, the three employees followed defendant to a motel parking lot where they again confronted him and demanded defendant return the keys. Defendant made a tight fist around one of the key fobs, so the ignition portion of the key was sticking out between his knuckles and, from within arm's reach, lunged at one of the employees while swiping or swinging at the employee's torso. Defendant did not make contact. When the employees backed off, defendant jumped a fence and tried to flee. Police officers arrived and pursued defendant. Officers subdued defendant after a brief struggle, during which three of the officers suffered minor injuries.
Defendant was charged with and convicted of robbery, assault with a deadly weapon, and resisting arrest. Defendant admitted he had suffered a strike conviction, and the trial court sentenced him to state prison for 14 years four months. On appeal, defendant argues: (1) his conviction for assault with a deadly weapon is not supported by substantial evidence because there is no evidence he used the car keys in a manner that was capable of inflicting and likely to cause great bodily injury; (2) the trial court abused its discretion by imposing consecutive sentences on the robbery and resisting arrest counts, under the mistaken belief it could only impose concurrent sentences if it struck defendant's strike prior; (3) the minutes of sentencing and abstract of judgment do not accurately reflect the oral pronouncement of sentence with respect to restitution and parole revocation fines; and (4) the minutes of sentencing contain a clerical error because they state defendant admitted two strike priors instead of one.
In the published portion of our prior opinion, we concluded defendant's conviction for assault with a deadly weapon was supported by substantial evidence. ( People v. Koback (2018) 25 Cal.App.5th 323, review granted Oct. 24, 2018, S250870.) In the unpublished portion of our prior opinion, we held the trial court erred when it concluded the only way it could impose concurrent sentences on defendant's robbery and resisting arrest convictions was if it first struck defendant's admitted strike prior. We reversed the sentence and remanded for the trial court to resentence *916 defendant and to consider in the first instance whether concurrent sentencing is appropriate in this case. Because we reversed the sentence, we left it to the trial court on remand and the Department of Corrections and Rehabilitation to ensure *853 the minutes and abstract of judgment would accurately reflect whatever sentence the court imposed on remand.
The California Supreme Court granted defendant's petition for review on the issue of the sufficiency of the evidence to support his conviction for assault with a deadly weapon. The Supreme Court subsequently transferred the appeal back to this court with directions to vacate our prior opinion and reconsider the appeal in light of In re B.M. (2018) 6 Cal.5th 528, 241 Cal.Rptr.3d 543, 431 P.3d 1180 ( B.M. ). ( People v. Koback (2019) --- Cal.5th ----, 244 Cal.Rptr.3d 871, 436 P.3d 898.) We have vacated our prior opinion and received supplemental briefs from the parties addressing the impact of B.M. on this case.
We once again affirm defendant's conviction for assault with a deadly weapon, reverse the sentence, and again remand for the trial court to resentence defendant and to consider in the first instance whether to impose concurrent sentences on counts 2 and 3.
II. PROCEDURAL BACKGROUND
In an information, the People charged defendant with assault with a deadly weapon other than a firearm, to wit, a key ( Pen. Code, § 245, subd. (a)(1), count 1); robbery ( Pen. Code, § 211, count 2); and (3) resisting arrest ( Pen. Code, § 69, count 3). The People alleged defendant suffered two prior prison terms ( Pen. Code, § 667.5, subd. (b) ), to wit: a 2013 conviction for possessing a controlled substance ( Health & Saf. Code, § 11377, subd. (a) ) and a 2011 conviction for attempted carjacking ( Pen. Code, §§ 664, 215 ). Finally, the People alleged defendant's 2011 conviction for attempted carjacking was a serious felony and a serious and violent felony. ( Pen. Code, §§ 667, subds. (a), (c), (e)(1), 1170.12, subd. (c)(1).)
A jury found defendant guilty on all three counts. In a bifurcated proceeding, defendant admitted his 2011 conviction for attempted carjacking was a strike. The trial court sentenced defendant to a total term of 14 years four months in state prison.
Defendant timely appealed.
*917 III. FACTS
On November 6, 2015, defendant walked into a rental car company office, grabbed a set of car keys from the front desk, and walked out.[1] Chase,[2] an employee who was manning the front desk, learned what had happened from a customer and followed defendant into the parking lot. Chase told defendant to stop, and said, "Please give me the keys." Defendant kept walking away, pretended not to know anything about the keys, and reached into the pocket of his sweatpants. Fearing defendant might be armed, Chase backed off and enlisted the help of two other employees who happened to be nearby, Agustin and Arthur. The three employees formed a wide circle around defendant to prevent him from leaving.
Chase and Agustin noticed one of the keys was hanging out of defendant's pocket, and they demanded defendant return the keys. Defendant stopped and stood facing Agustin and Arthur from about two feet away. Chase backed off and stood about five feet behind defendant. Defendant appeared to be getting angry. Defendant *854 again reached into his pocket, "like he was going to go for something." Defendant told the men to "back up" or "move," or he would "fuck" them up. He then began to walk away across the street. The employees then got into Arthur's car and followed defendant into a motel parking lot across the street.
The three men stood around defendant in the motel parking lot and again demanded that defendant return the car keys. Chase testified defendant stood "[a]bout a foot from arm's reach" away from the three men, but Agustin was closest to defendant. Agustin testified defendant stood two to three feet away from him, and was within arm's reach. Defendant asked, "You want the keys?" He then took the car keys from his pocket, made a tight fist, and held one of the keys with the "sharp"[3] or ignition end of the key sticking out *918 between his knuckles. Defendant then "charged," "came at," or "lunged" at Agustin and "swung" or "swiped" the key at Agustin's torso.[4] Arthur described defendant's motion like "throwing a punch." Agustin testified he was nervous and afraid he might get hurt because defendant swung the key at him "with force." Chase testified he did not believe defendant was close enough to Agustin to actually make contact. But Agustin testified he was not hit "because my nephew [i.e., Arthur] pulled me back." Arthur testified, "If I didn't move [Agustin], he probably would have got hit." The three men backed away from defendant.
Defendant then put the keys back into his pocket, took off, and scaled the wall behind the motel. The employees got back into the car and found defendant as he walked along one of the streets behind the motel. They followed defendant by car through a small area of shops and streets for about 40 minutes, until law enforcement arrived and took over the pursuit. Several deputies chased down and subdued defendant. Defendant resisted, and three deputies were injured in the process.
Defendant testified he found the car keys next to a bus stop. Defendant ran from the police because he feared for his life. He denied taking the car keys from the rental car company office, denied resisting arrest, and denied that he swung the keys at Agustin.
IV. DISCUSSION
A. Substantial Evidence Supports Defendant's Conviction for Assault with a Deadly Weapon.
Defendant argues his conviction for assault with a deadly weapon is not supported *855 by substantial evidence because he did not use the car keys-an object that is not inherently deadly or dangerous-in a manner capable of causing and likely to result in serious bodily injury. On this record, we conclude defendant did, in fact, use the car keys as a deadly weapon. *919 1. Standard of review.
Our standard of review is well settled. "We ' " 'must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence-that is, evidence which is reasonable, credible, and of solid value-such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " ' " ( People v. Brooks (2017) 3 Cal.5th 1, 57, 219 Cal.Rptr.3d 331, 396 P.3d 480 ; see B.M. , supra , 6 Cal.5th at pp. 536, 539, 241 Cal.Rptr.3d 543, 431 P.3d 1180.)
" ' " 'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " ' " ' " ( People v. Harris (2013) 57 Cal.4th 804, 849-850, 161 Cal.Rptr.3d 364, 306 P.3d 1195.) " 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' " ( People v. Albillar (2010) 51 Cal.4th 47, 60, 119 Cal.Rptr.3d 415, 244 P.3d 1062.)
" 'A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' " ( People v. Manibusan (2013) 58 Cal.4th 40, 87, 165 Cal.Rptr.3d 1, 314 P.3d 1.)
2. Applicable law.
"Any person who commits an assault upon the person of another with a deadly weapon or instrument other than a firearm shall be punished by imprisonment in the sate prison for two, three, or four years, or in a county jail for not exceeding one year, or by a fine not exceeding ten thousand dollars ($10,000), or by both the fine and imprisonment." ( Pen. Code, § 245, subd. (a)(1) ; all undesignated statutory references are to the Penal Code.)
"As used in section 245, subdivision (a)(1), a 'deadly weapon' is 'any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury.' [Citation.] Some few objects, such as dirks and blackjacks, have been held to be deadly weapons as a matter of law; the ordinary use for which they are designed established their character as such. [Citation.] Other objects, while not deadly per se, may be used, under certain circumstances, in a manner likely to produce death or great bodily injury. In determining whether an *920 object not inherently deadly or dangerous is used as such, the trier of fact may consider the nature of the object, the manner in which it is used, and all other facts relevant to the issue." ( People v. Aguilar (1997) 16 Cal.4th 1023, 1028-1029, 68 Cal.Rptr.2d 655, 945 P.2d 1204 ( Aguilar ).)
The minor in B.M. , supra , 6 Cal.5th 528, 241 Cal.Rptr.3d 543, 431 P.3d 1180, took a six-inch "butter knife" with small ridges on one edge and made a few downward stabbing motions at her sister's legs. The sister was wearing nothing but a bath towel and, *856 just before the attack, covered herself with a blanket. The knife did not penetrate the blanket or cause any injury, and the sister testified the pressure she felt from the knife was five or six on a scale of one to 10. ( Id. at p. 531, 241 Cal.Rptr.3d 543, 431 P.3d 1180.) The juvenile court sustained an allegation the minor committed an assault with a deadly weapon. ( Id. at pp. 531-532, 241 Cal.Rptr.3d 543, 431 P.3d 1180.) The Court of Appeal affirmed, reasoning, " '[i]t matters not that [the sister] was able to fend off great bodily injury with her blanket' or 'that [B.M.] was not adept at using a knife' because B.M. 'could have easily inflicted great bodily injury with this metal butter knife and just as easily [could] have committed mayhem upon the victim's face.' " ( Id. at p. 532, 241 Cal.Rptr.3d 543, 431 P.3d 1180.) The appellate court expressly disagreed with In re Brandon T. (2011) 191 Cal.App.4th 1491, 120 Cal.Rptr.3d 637, which had held a butter knife with a round end and serrated edge was not used as a deadly weapon when a minor made a slashing motion to the victim's cheek and throat with sufficient force to cause the blade of the butter knife to break, caused welts and scratches to the victim, but did not draw blood. ( Id. at pp. 1496-1498, 120 Cal.Rptr.3d 637.)
In B.M. , supra , 6 Cal.5th 528, 241 Cal.Rptr.3d 543, 431 P.3d 1180, the Supreme Court clarified the law with respect to assault with a deadly weapon when the object used is not an inherently deadly weapon and distilled three principles to be applied in such cases:
"First, the object alleged to be a deadly weapon must be used in a manner that is not only 'capable of producing' but also ' "likely to produce death or great bodily injury." ' ( Aguilar , supra , 16 Cal.4th at p. 1029 [68 Cal.Rptr.2d 655, 945 P.2d 1204], italics added.)" ( B.M. , supra , 6 Cal.5th at p. 533, 241 Cal.Rptr.3d 543, 431 P.3d 1180.) The court rejected the Attorney General's argument " 'capable of producing' and 'likely to produce' are essentially the same because the term ' "likel[y]" ' has the same meaning as ' "possib[le]." ' " ( Ibid. ) Citing dictionaries (see discussion of B.M. 's concurring opinion, post ), the court stated the Attorney General's definition was "at odds with the ordinary meaning of 'likely.' " ( Ibid. ) And citing decisions holding felony child abuse " 'likely to produce great bodily harm or death' " (§ 273a) refers to abuse in situations where the probability of serious injury is great, the court indicated the Attorney General's definition "is also inconsistent with how we have treated the term 'likely to produce bodily harm or death' elsewhere in the Penal Code." ( B.M. , at p. 533, 241 Cal.Rptr.3d 543, 431 P.3d 1180.)
*921 The Supreme Court also rejected the Attorney General's assertion an object is likely to produce death or great bodily injury if its use " ' "in an assault increases the likelihood of great bodily injury." ' " ( B.M. , supra , 6 Cal.5th at p. 534, 241 Cal.Rptr.3d 543, 431 P.3d 1180.) "[T]he fact that B.M.'s use of a butter knife may have increased the likelihood of serious injury does not establish that her use of the object was likely to cause serious injury. An increase in likelihood from impossible to unlikely, for example, does not show that the object was likely to cause serious harm. The use of an object in a manner 'likely to produce' death or great bodily injury [citation] requires more than a mere possibility that serious injury could have resulted from the way the object was used." ( Id. at p. 534, 241 Cal.Rptr.3d 543, 431 P.3d 1180.)
"Second, the Aguilar standard does not permit conjecture as to how the object could have been used. Rather, the determination of whether an object is a *857 deadly weapon under section 245 [, subdivision ](a)(1) must rest on evidence of how the defendant actually 'used' the object." ( B.M. , supra , 6 Cal.5th at p. 534, 241 Cal.Rptr.3d 543, 431 P.3d 1180.) " '[E]xcept in those cases involving an inherently deadly weapon[,] the jury's decisionmaking process in an aggravated assault case ... is functionally identical regardless of whether ... the defendant employed a weapon alleged to be deadly as used or employed force likely to produce great bodily injury; in either instance, the decision turns on the nature of the force used.' " ( Id. at p. 535, 241 Cal.Rptr.3d 543, 431 P.3d 1180.)
Although the Supreme Court held "it is inappropriate to consider how the object could have been used as opposed to how it was actually used," the court made clear "it is appropriate in the deadly weapon inquiry to consider what harm could have resulted from the way the object was actually used. Analysis of whether the defendant's manner of using the object was likely to produce death or great bodily injury necessarily calls for an assessment of potential harm in light of the evidence. As noted, a mere possibility of serious injury is not enough. But the evidence may show that serious injury was likely, even if it did not come to pass." ( B.M. , supra , 6 Cal.5th at p. 535, 241 Cal.Rptr.3d 543, 431 P.3d 1180, italics added.) The Supreme Court faulted the Court of Appeal for engaging in conjecture by stating B.M. might have committed mayhem on the victim's face. "There is no evidence that B.M. stabbed, sliced, or pointed the butter knife toward or near [her sister's] face, or that B.M. attempted or threatened to do so. Nor is there evidence that B.M. was flailing her hand with the butter knife or otherwise wielding it wildly or uncontrollably. (Cf. People v. Simons (1996) 42 Cal.App.4th 1100, 1106 [50 Cal.Rptr.2d 351]... ( Simons ).)" ( Ibid. ; see id. at p. 538, 241 Cal.Rptr.3d 543, 431 P.3d 1180 [rejecting the Court of Appeal's statement it was through sheer luck the sister was not injured, stating, "the inquiry must focus on the evidence of how B.M. actually used the knife, not on various conjectures as to how she could have used it"].)
*922 "Third, although it is appropriate to consider the injury that could have resulted from the way the object was used," the Supreme Court cautioned "the extent of actual injury or lack of injury is also relevant." ( B.M. , supra , 6 Cal.5th at p. 535, 241 Cal.Rptr.3d 543, 431 P.3d 1180.) A conviction for assault with a deadly weapon does not require evidence of actual injury or contact, "but limited injury or lack of injury may suggest that the nature of the object or the way it was used was not capable of producing or likely to produce death or serious harm." ( Ibid. )
Applying those three principles, the Supreme Court concluded the evidence did not support a finding B.M. used the butter knife in a manner likely to produce death or great bodily injury. ( B.M. , supra , 6 Cal.5th at pp. 536, 539, 241 Cal.Rptr.3d 543, 431 P.3d 1180.) The court stated three circumstances supported its conclusion: "First, the record indicates the six-inch metal knife B.M. used was '[t]he type of knife that you would use to butter a piece of toast'; it was not sharp and had slight ridges on one edge of the blade. (See Brandon T. , supra , 191 Cal.App.4th at pp. 1496-1498 [120 Cal.Rptr.3d 637] [butter knife with 'rounded end' was incapable of causing serious injury even when applied to the victim's face with enough force to break the knife]; [ In re ] D.T. [ (2015) ] 237 Cal.App.4th [693,] 701 [188 Cal.Rptr.3d 273] [contrasting the butter knife in Brandon T. with a sharp pocketknife].)" ( B.M. , at p. 536, 241 Cal.Rptr.3d 543, 431 P.3d 1180.) "Second, B.M. used the knife only on [her sister's] legs, which were covered *858 with a blanket. There is no evidence that B.M. used or attempted to use the knife in the area of [her sister's] head, face, or neck, or any exposed part of her body." ( Ibid. ) "[And] [t]hird, the moderate pressure that B.M. applied with the knife was insufficient to pierce the blanket, much less cause serious bodily injury to [her sister]." ( Ibid. )
The Supreme Court rejected the Attorney General's argument the sister could have been seriously injured had she not defended herself by covering herself with a blanket. "[T]here is no evidence indicating [the sister] pulled the blanket over her legs after or in reaction to seeing B.M. begin a slicing or stabbing motion directed at [her] exposed legs.... Further, ... nothing in the record suggests that B.M., who was aware that [her sister's] legs were covered and that the knife was not penetrating the blanket, then used or tried to use the knife on an exposed part of [her sister's] body." ( B.M. , supra , 6 Cal.5th at p. 537, 241 Cal.Rptr.3d 543, 431 P.3d 1180, italics added.) Relevant here, the court stated, "To be sure, an aggressor should not receive the benefit of a potential victim fortuitously taking a defensive measure or being removed from harm's way once an assault is already underway. But the facts known to the aggressor before the assault, including defensive measures taken by the victim, are relevant to determining whether the aggressor used an object in a manner likely to cause serious injury." ( Ibid. , italics added.)
The Supreme Court also rejected the Attorney General's argument "that 'an object can be a deadly weapon even if there is no contact or injury, and *923 " 'even if it's not actually used with deadly force.' " ' " ( B.M. , supra , 6 Cal.5th at p. 538, 241 Cal.Rptr.3d 543, 431 P.3d 1180.) The court noted the cases the Attorney General cited "involved a sharp object applied to a vulnerable part of the body (D.T. , supra , 237 Cal.App.4th at pp. 697, 696 [188 Cal.Rptr.3d 273] [' "sharp" and "pointy" ' pocketknife used to 'poke[ ]' someone 'multiple times in the upper back' is a deadly weapon]; see D.T. , at pp. 699-701 [188 Cal.Rptr.3d 273] ; People v. Page (2004) 123 Cal.App.4th 1466, 1469 [20 Cal.Rptr.3d 857]... [' "sharp[,] pointy" ' pencil held up to someone's neck] ) or a sharp object wielded in a wild or uncontrolled manner ( Simons , supra , 42 Cal.App.4th at p. 1106 [50 Cal.Rptr.2d 351] [the defendant, being chased by police officers, ' "flail[ed] his hands ... [and] would bring [a] screwdriver forward" ' when approached] ). Here, the knife was not sharp or pointy; it was not applied to any vulnerable part of [the sister's] body; and there is no evidence that B.M. wielded the knife wildly or uncontrollably." ( Id. at p. 538, 241 Cal.Rptr.3d 543, 431 P.3d 1180.)
In a separate concurring opinion, Justice Chin (who fully joined the unanimous maj. opn.) clarified the Supreme Court did "not decid[e] the meaning of the word 'likely' in the phrase ' "capable of producing and likely to produce, death or great bodily injury." ' " ( B.M. , supra , 6 Cal.5th at p. 539, 241 Cal.Rptr.3d 543, 431 P.3d 1180 (conc. opn. of Chin, J.).) Justice Chin stated the court had only determined " 'likely' " "means something 'more than a mere possibility.' (Maj. opn., ante , at p. 534 [241 Cal.Rptr.3d 543, 431 P.3d 1180] ; see id. at p. 535 [241 Cal.Rptr.3d 543, 431 P.3d 1180].)" ( B.M. , at p. 539, 241 Cal.Rptr.3d 543, 431 P.3d 1180 (conc. opn. of Chin, J.).) Although the majority opinion had cited dictionary definitions of the word " 'likely' " as meaning " ' "having a high probability," ' ' "very probable," ' or a ' " ' "probability [that is] great," ' " ' " to disprove the Attorney General's argument " 'likely' means 'probable,' " Justice Chin cautioned against reading the majority opinion as having adopted such definitions. ( Ibid. )
*859 "Indeed, such a holding would be inconsistent with the majority's citations to In re D.T. (2015) 237 Cal.App.4th 693 [188 Cal.Rptr.3d 273]..., People v. Page (2004) 123 Cal.App.4th 1466 [20 Cal.Rptr.3d 857]..., and People v. Simons (1996) 42 Cal.App.4th 1100 [50 Cal.Rptr.2d 351].... (See maj. opn., ante , at p. 538 [241 Cal.Rptr.3d 543, 431 P.3d 1180].) Those cases all involved the use of a sharp object in a threatening manner, and in all three cases an argument could be made that great bodily injury was not probable , but the deadly weapon finding was nonetheless upheld." ( B.M. , at pp. 539-540, 241 Cal.Rptr.3d 543, 431 P.3d 1180 (conc. opn. of Chin, J.).)
Finally, Justice Chin suggested that, when the Supreme Court does squarely address the meaning of " 'likely' " for purposes of assault with a deadly weapon, "our resolution of the question [will] call[ ] for a careful analysis like the one that appears in People v. Superior Court (Ghilotti ) (2002) 27 Cal.4th 888 [119 Cal.Rptr.2d 1, 44 P.3d 949]..., a decision involving the meaning of the word 'likely' in the Sexually Violent Predators Act ( Welf. & Inst. Code, § 6600 et seq. ), which refers to persons 'likely to engage in acts of sexual violence' (id. , § 6601, subd. (d).) That opinion shows that, in the *924 context of a law designed to prevent harm, 'likely' can sometimes mean something less than 'probable.' " ( B.M. , supra , 6 Cal.5th at p. 540, 241 Cal.Rptr.3d 543, 431 P.3d 1180 (conc. opn. of Chin, J.).)
3. Analysis.
Viewing the evidence in the light most favorable to the judgment, as we must, we again conclude defendant used the car key in a manner capable of causing and likely to result in great bodily injury. The evidence presented at trial demonstrated that, when the three employees of the dealership confronted defendant in the motel parking lot, defendant took the stolen car keys from his pocket and made a fist so that the "sharp" end of one of the keys stuck out from between his knuckles. Defendant then "charged," "came at," or "lunged" at Agustin. And, when he was within reach of Augustin, defendant "swung," "swiped," or "punch[ed]" at Agustin's torso "with force." True, defendant did not actually strike Agustin, and Chase (who was not the closest of the three men to defendant) believed defendant was too far away to contact Agustin. But the evidence presented at trial demonstrated it was only Arthur's intervention that prevented defendant from striking Agustin. Agustin testified he was not hit "because my nephew [i.e., Arthur] pulled me back," and Arthur testified, "If I didn't move [Agustin], he probably would have got hit."
We believe this case is similar to People v. Simons (1996) 42 Cal.App.4th 1100, 50 Cal.Rptr.2d 351 ( Simons ), a case the Supreme Court cited with at least implicit approval in B.M. (See B.M. , supra , 6 Cal.5th at pp. 535, 538, 241 Cal.Rptr.3d 543, 431 P.3d 1180.) The defendant in Simons held several armed police officers at bay with a screwdriver, an object the court described as "not an inherently deadly weapon." ( Simons , at p. 1107, 50 Cal.Rptr.2d 351.) Although instructed to drop the tool, the defendant flailed it about and urged the officers to shoot him. On those facts, the court found that for purposes of the crime of exhibiting a deadly weapon to prevent arrest (§ 417.8), "[t]he evidence clearly demonstrated that the screwdriver was capable of being used as a deadly weapon and that defendant intended to use it as such if the circumstances required." ( Simons , at p. 1107, 50 Cal.Rptr.2d 351.)
Like a screwdriver, a car key is not an inherently deadly weapon. But like *860 the defendant in Simons , who used the screwdriver to keep police officers at bay, defendant swung the key to keep the three rental car company employees at bay. As with Simons , defendant did not actually strike Agustin so there were no resultant injuries. But, as the Supreme Court made clear in B.M. , we may consider the injuries that likely would have resulted from the way defendant actually used the key. ( B.M. , supra , 6 Cal.5th at p. 535, 241 Cal.Rptr.3d 543, 431 P.3d 1180.) Whereas in B.M. the minor stabbed her sister on her legs, which were covered with a blanket, the defendant in Simons wildly and uncontrollably flailed the screwdriver at officers who were presumably clothed in standard police uniforms. *925 (See Simons , supra , 42 Cal.App.4th at pp. 1105-1106, 50 Cal.Rptr.2d 351.) Here, defendant "lunged," "charged," or "came at" Agustin and, "with force," "swung," "swiped," or "punch[ed]" the key at Agustin's torso , a much more vulnerable part of the body than an extremity, that was clothed in a polo shirt. And, but for Arthur pulling Agustin back, defendant would have struck Agustin. As the Supreme Court stated in B.M. , "an aggressor should not receive the benefit of a potential victim fortuitously ... being removed from harm's way once an assault is already underway." ( B.M. , at p. 537, 241 Cal.Rptr.3d 543, 431 P.3d 1180.) From the way defendant wielded the key, we conclude there was more than a mere possibility Agustin would have suffered serious bodily injury if defendant had succeeded in striking him and, therefore, the evidence supports the conclusion defendant used the key in a manner that was both capable of producing and likely to produce serious bodily injury.[5] ( Id. at pp. 534-535, 241 Cal.Rptr.3d 543, 431 P.3d 1180.)
This court has previously relied on Simons when concluding a not inherently deadly instrument was used as a deadly weapon. In People v. Page (2004) 123 Cal.App.4th 1466, 20 Cal.Rptr.3d 857 ( Page ), another decision the Supreme Court in B.M. at least implicitly approved of (see B.M. , supra , 6 Cal.5th at p. 538, 241 Cal.Rptr.3d 543, 431 P.3d 1180 ), the defendant and his female accomplice robbed the victim and, after rifling the victim's pockets for his wallet, the female accomplice held a sharp pencil to the victim's neck and told him not to call the police. ( Page , at pp. 1468-1469, 20 Cal.Rptr.3d 857.) The defendant challenged his conviction for assault with a deadly weapon contending the pencil was not a deadly weapon. ( Id. at p. 1470, 20 Cal.Rptr.3d 857.)
Relying on Simons and similar cases, this court concluded the accomplice used the pencil in such a manner capable of producing serious bodily injury and, therefore, under the facts of that case the pencil was a deadly weapon as a matter of law. ( Id. at pp. 1470-1473, 20 Cal.Rptr.3d 857.) We rejected the suggestion that Simons was distinguishable simply because it did not address the aggravated assault statute. " '[N]o sound reason appears to define a "deadly weapon" for purposes of section 245 differently than it is defined in other contexts under other statutes.' [Citations.] Cases discussing the definition of a deadly weapon routinely rely on other cases dealing with different statutes." ( Page , at p. 1472, 20 Cal.Rptr.3d 857.)
More recently, in In re D.T. (2015) 237 Cal.App.4th 693, 188 Cal.Rptr.3d 273 ( D.T. )-again, a case the Supreme Court at least implicitly approved of in B.M. (see B.M. , supra , 6 Cal.5th at pp. 536, 538, 241 Cal.Rptr.3d 543, 431 P.3d 1180 )-the juvenile *861 court found a minor committed an assault with a deadly weapon when he poked a classmate in the back with the sharp end of a pocketknife. The victim testified, "[t]he knife felt 'sharp' and *926 'pointy,' and [she] felt some pain. She did not think minor would hurt her, or that he was trying to cut or kill her. However, the victim was scared that an injury might occur because minor had a knife pressed to her back." ( D.T. at p. 697, 188 Cal.Rptr.3d 273.) The investigating officer testified similar knives can cause serious injury or death. ( Ibid. )
On appeal, the minor in D.T. , supra , 237 Cal.App.4th 693, 188 Cal.Rptr.3d 273, argued the knife was not likely to cause death or great bodily injury. Relying on our decision in Page and on Simons , we disagreed. "[I]n Page this court found a pencil, which is less sharp and less likely to cause serious harm than a knife, to be a deadly weapon when it was held against a victim's throat without any slicing or stabbing motions. ( People v. Page , supra , 123 Cal.App.4th at p. 1472 [20 Cal.Rptr.3d 857].) Even more supportive of our point is People v. Simons (1996) 42 Cal.App.4th 1100, 1106-1107 [50 Cal.Rptr.2d 351]..., in which the court held that a screwdriver was a deadly weapon even though the defendant had only brandished it at police officers without actually touching anyone. If a pencil held to a victim's neck, and a screwdriver that is only used to threaten from a distance , are both likely to cause death or serious bodily injury, then so is a sharp knife held to the back of a victim. As we have explained, the test is whether the knife was ' "used in such a manner as to be capable of producing and likely to produce , death or great bodily injury." [Citation.]' ( Aguilar , supra , 16 Cal.4th at pp. 1028-1029 [68 Cal.Rptr.2d 655, 945 P.2d 1204], italics added.) Because the knife was sharp, and because minor held it against the victim in such a way that a sudden distraction or misstep could have resulted in a serious puncture wound, the knife had the capacity to cause serious bodily injury or death. It therefore meets the Aguilar standard for likelihood." ( D.T. , at pp. 700-701, 188 Cal.Rptr.3d 273, first italics added, second italics in original.)
As in Page and D.T. , we continue to find Simons persuasive. If using a screwdriver to fend off police officers from a distance is likely to result in serious injury, then forcefully swinging, swiping, or punching a car key at a victim's torso from a short distance is also likely to result in serious injury.
B. The Trial Court Must Determine on Resentencing Whether to Impose Concurrent Sentences on Counts 1 and 3.
Defendant contends, and we agree, the trial court inaccurately believed it could only sentence defendant on counts 1 and 3 concurrently with the sentence on count 2 if it first struck defendant's strike. We reverse the sentence and remand for the trial court to consider in the first instance whether concurrent sentences on counts 1 and 3 are appropriate.
At sentencing, defense counsel asked the trial court to sentence defendant to nine years on count 2 (the low term of two years, doubled under the one *927 strike law, plus a five-year enhancement for the prior serious felony conviction). Counsel also requested the court consider imposing concurrent sentences for counts 1 and 3: "We would obviously greatly appreciate it if the Court would run the time concurrent on the other two counts but, should the Court be inclined not to run that concurrent, that it run one-third the midterm for two years on Count 1." The court indicated its belief that, for the sentences on counts 1 and 3 to run concurrently with count 2, "I'd have to *862 strike the strike for those counts." Counsel stated she was not asking the court to strike the strike. The court then stated, "I think it has to be consecutive unless I strike the strike. I can do that for those subsequent counts[, i.e., counts 1 and 3], impose it one time [on count 1] then strike it."
The trial court designated count 2 as the principal count, and sentenced defendant to the middle term of three years, doubled pursuant to the one strike law, for a term of six years in state prison. On count 1, the trial court sentenced defendant to one-third the middle term of three years. But rather than strike the strike conviction, the court doubled the term pursuant to the one strike law for a term of two years in state prison to run consecutively to count 2. Similarly, the trial court sentenced defendant to one-third the middle term of two years on count 3, doubled pursuant to the one strike law, for a term of one year four months in state prison to be served consecutively to count 2. Finally, the trial court imposed a five-year sentence enhancement for defendant's prior serious felony conviction, to be served consecutively to count 2, for a total term of 14 years four months in state prison.
"If there is a current conviction for more than one felony count not committed on the same occasion, and not arising from the same set of operative facts , the court shall sentence the defendant consecutively on each count ...." ( §§ 667, subd. (c)(6), 1170.12, subd. (a)(6), italics added.) Under the plain language of the statutes, the trial court has no discretion to sentence a defendant to concurrent sentences under the three strikes law when the current felony convictions were not committed on the same occasion or did not arise from the same operative facts. In that situation, consecutive sentences are mandatory. ( People v. Hojnowski (2014) 228 Cal.App.4th 794, 800, 175 Cal.Rptr.3d 706.) But the trial court has discretion to impose concurrent sentences if it concludes the current convictions were committed on the same occasion or did arise from the same operative facts ( People v. Casper (2004) 33 Cal.4th 38, 42, 14 Cal.Rptr.3d 43, 90 P.3d 1203 ), unless a consecutive sentence is otherwise mandated by another statute ( People v. Torres (2018) 23 Cal.App.5th 185, 198, 232 Cal.Rptr.3d 614 ).
As noted, the trial court indicated it believed it could impose concurrent sentences on counts 1 and 3 only if it first struck defendant's strike conviction. The People contend the record does not affirmatively demonstrate *928 the trial court misunderstood its limited discretion to impose concurrent sentences under the three strikes law, and the court's "vague statement" does not overcome the presumption the court understood its discretion. The trial court was not vague in the least. To repeat, when defense counsel asked for the court to impose consecutive sentences on counts 1 and 3, the court said, "I'd have to strike the strike for those counts. " (Italics added.) The court also said, "I think it has to be consecutive unless I strike the strike. I can do that for those subsequent counts[, i.e., counts 1 and 3], impose it one time [on count 1] then strike it." (Italics added.) On this record, we are not persuaded the trial court understood it had discretion to impose concurrent sentences. "[W]hen the record indicates the court misunderstood or was unaware of the scope of its discretionary powers, we should remand to allow the court to properly exercise its discretion." ( People v. Bolian (2014) 231 Cal.App.4th 1415, 1421, 180 Cal.Rptr.3d 890.)
The People also argue that, if we conclude the trial court misunderstood its discretion, we should not remand for resentencing because there is no possibility the trial court will conclude the offenses were *863 committed on the same occasion or did arise out of the same operative facts. According to the People, the record supports the trial court's implied findings that the current offenses were not all committed on the same occasion or did not arise from the same operative facts.
We might be inclined to apply the doctrine of implied findings but for the fact the trial court sentenced defendant under the clear misapprehension that striking a strike was the only way to impose a concurrent sentence, and there is no indication whatsoever the court implicitly concluded the crimes were not committed on the same occasion and did not arise from the same operative facts. Although we agree with the People that arguably defendant's offenses of robbery and resisting arrest were not committed on the same occasion and did not arise from the same set of operative facts, it is a much closer call with respect to his offenses of robbery and assault with a deadly weapon. Such a determination is much better left to the trial court in the first instance.
C. Errors in the Minute Order from Sentencing and Abstract of Judgment.
Defendant argues, and the People agree, there is an error in the minute order from the sentencing hearing regarding his prior felony admission. The People originally alleged defendant had suffered two prior felony convictions: a 2013 conviction for possession of a controlled substance and a 2011 strike conviction for attempted carjacking. At the sentencing hearing, however, the prosecution pursued only the prior conviction for carjacking after agreeing *929 with defense counsel the drug conviction was likely to be reduced to a misdemeanor under Proposition 47. Defendant then waived his right to a jury trial and admitted the attempted carjacking conviction. However, the minute order erroneously states, "Defendant admits Prior(s) 01 [and] 02," and "Court orders Prior(s) 02 Stricken."
Defendant also contends the minute order and abstract of judgment do not reflect the oral pronouncement of the restitution fine and parole revocation fine. Section 1202.4 mandates every defendant convicted of a felony pay a restitution fine of no less than $300 and no more than $10,000. (§ 1202.4, subd. (b)(1).) The court may, in its discretion, impose a restitution fine using the following formula: the minimum fine ($300), times the "number of years of imprisonment the defendant is ordered to serve," times "the number of felony counts of which the defendant is convicted." (Id. , subd. (b)(2).) The court must also impose a parole revocation fine in the same amount as the restitution fine. (§ 1202.45, subd. (a).)
In its report and sentencing recommendation, the probation department recommended the trial court consider count 2 as the principal count and sentence defendant as follows: the middle term of three years on count 2, doubled under the one strike law should the prior strike be found true; one-third the middle term of three years on count 1, doubled if the court found true the strike allegation; and one-third the middle term of two years on count 3, again, doubled should the court find true the strike allegation. Therefore, the probation department recommended a total state prison sentence of four years eight months if the strike prior was not found true and a sentence of 15 years four months if it was found true (this included the five-year enhancement for the strike prior, and a one-year enhancement for the prison prior defendant did not admit). Based on the minimum recommended prison sentence of four years eight months (assuming the strike prior was not found *864 true), the probation department recommended the trial court impose restitution and parole revocation fines in the amount of $3,600 each, using the formula set forth in section 1202.4, subdivision (b)(1) (minimum fine ($300) x years in prison (4) x number of convictions (3) = $3,600).
With the exception of the one-year enhancement for the alleged prison prior, that defendant did not admit, the trial court followed the probation department's recommendation for sentencing. It did not, however, impose the recommended restitution and parole revocation fines. The court plainly stated on the record, "I shall impose a minimum restitution fine and other fines." Yet, the minutes from sentencing and the abstract of judgment both indicate defendant was ordered to pay a restitution fine of $3,600 and a parole revocation fine of $3,600. This was plainly in error. As noted, the minimum restitution and parole revocation fine is $300. (§§ 1202.4, subd. (b)(1), 1202.45, subd. (a).)
*930 The People argue the minutes and abstract of judgment reflect the correct restitution and parole revocation fines as permitted by section 1202.4, subdivision (b)(2). But, the People's argument presupposes the trial court intended to impose a fine using that formula. Nothing supports that conclusion. The trial court said, clearly and unambiguously, it was imposing the "minimum restitution fine and other fines." (Italics added.) There is no wiggle room there.
Moreover, arithmetic is not on the People's side. The probation department recommended a restitution and parole revocation fine of $3,600 based on the assumption defendant's strike prior would not be found true, and defendant would only be sentenced to four years eight months. Had the trial court intended to impose restitution and parole revocation fines using the formula set forth in section 1202.4, subdivision (b)(2), the correct figure would have been $10,000 (minimum fine ($300) x years of imprisonment (14) x number of convictions (3) = $12,600, capped at the maximum fine of $10,000).
Because we reverse the sentence and remand for resentencing, we need not direct the minutes and abstract of judgment to be corrected. When defendant is resentenced, we presume the minutes will accurately reflect defendant only admitted one strike prior. The trial court is, of course, free at resentencing to impose a new restitution and parole revocation fine. Should the court once more impose the minimum fines, we presume the minutes of sentencing and abstract of judgment will so reflect.
V. DISPOSITION
The sentence is reversed. At resentencing, the trial court must consider whether concurrent sentences on counts 1 and 3 are appropriate pursuant to Penal Code sections 667, subdivision (c)(6), and 1170.12, subdivision (a)(6).
In all other respects, the judgment is affirmed.
I concur:
MILLER, J.

The set consisted of two car keys attached to key "fobs," and a tag from the rental car company, on a wire ring.

We refer to the three witnesses by their first names only, and we mean no disrespect in doing so. We point out that the record includes different spellings of the same witnesses, i.e., Agustine/Agustin and Arthur/Arturo. We will use Agustin and Arthur, respectively.

In his briefs, defendant describes the ignition end of the key that was protruding from his knuckles as "blunt." No witness described the end of the key as "blunt," and defendant's characterization of the key ignores the actual testimony in this case. Chase testified on direct examination defendant held the "[k]ey in between the knuckles." The prosecutor asked, "So the sharp end of the key was sticking out from between the knuckles?" Chase answered, "Yes." Augustin also testified on direct that defendant gripped the key between his fingers, so it was protruding through his knuckles. The prosecutor asked Augustin, "So the sharp end of the key was protruding out from his hand, right?" Augustin answered, "Yes." (See People v. Margarejo (2008) 162 Cal.App.4th 102, 107, 75 Cal.Rptr.3d 465 ["Counsel's questions themselves are not evidence, but the question's wording typically is relevant to a reasonable interpretation of the witness's answer. Often it is vital to consider the question to understand anything about the answer, as with answers like 'yes.' "].) And, as explained, post , we are required to view the evidence in favor of the judgment. (People v. Thomas (2017) 15 Cal.App.5th 1063, 1071, 223 Cal.Rptr.3d 470.)

Augustin testified he was wearing a green shirt, with "Enterprise" on it. Earlier, Chase had testified Arthur and Augustin were wearing green polo shirts provided to the dealership's "[c]ar wash reps."

We need not conclude it was more probable than not the manner in which defendant wielded the key at Agustin's torso would have resulted in serious injury. (B.M., supra , 6 Cal.5th at pp. 539-540, 241 Cal.Rptr.3d 543, 431 P.3d 1180 (conc. opn. of Chin, J.).)