Filed 10/5/20  P. v. Aldaco CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>BEVERLY ALDACO,<br><br>    Defendant and Appellant. | F077443<br><br>(Super. Ct. No. PCF353757)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Tulare County.  Michael B. Sheltzer, Judge.

Peggy A. Headley, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christofferson and Nirav K. Desai, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Beverly Aldaco was charged with six felony offenses: in Counts 1 and 2, assault on a peace officer or firefighter (Pen. Code, § 245, subd. (c))[1] and in Counts 3–6, resisting an executive officer (§ 69).  She was charged with one misdemeanor offense in Count 7, illegal

---

[1]    All further statutory references are to the Penal Code unless otherwise stated.

conduct at a burning building (§ 148.2). The following sentencing enhancements were alleged: as to Count 1, use of a deadly weapon (§ 12022, subd. (b)(1)), infliction of great bodily injury (§ 12022.7, subd. (a)); as to Counts 1–3 a prior serious felony conviction (§ 667, subd. (a)(1)); and as to Counts 1–6 that Aldaco had suffered a prior strike conviction (§§ 667, subds. (b)–(i); 1170.12, subds. (a)–(d)), and that Aldaco had suffered four prior felonies, making her ineligible for probation (§ 1203, subd. (e)(4)).

Following the prosecution's case in chief, the trial court granted Aldaco's motion to dismiss the section 12022.7, subdivision (a) allegation of great bodily injury as to Count 1. A jury found Aldaco guilty of Counts 1, 4, 5, 6, and 7, and found true the personal use of a deadly weapon in Count 1. It found her not guilty of Counts 2 and 3. In a bifurcated proceeding, the trial court found the allegations of a prior strike and prior serious felony convictions true.

At sentencing, the trial court granted the motion to dismiss Aldaco's prior strike conviction and sentenced her to eight years and eight months in prison: three years on Count 1; a consecutive eight months on Count 4; a concurrent two years each on Counts 5 and 6; a concurrent six months on Count 7; and a consecutive five years for the section 667, subdivision (a)(1) prior serious felony conviction. Sentence on the section 12022, subdivision (b)(1) weapon enhancement was stayed.

On appeal, Aldaco contends there is insufficient evidence to support her conviction under section 245, subdivision (c) in Count 1; under section 69 in Count 6; and under section 148.2 in Count 7. Aldaco also contends the trial court erred in not giving CALCRIM No. 355, and in impermissible judicial factfinding regarding her prior strike. Because we agree there is insufficient evidence to sustain Aldaco's prior strike and prior serious felony conviction, we strike the section 667, subdivision (a)(1) enhancement imposed. We also strike the section 12022, subdivision (b)(1) enhancement imposed and stayed. We otherwise reject Aldaco's claims and affirm the judgment.

STATEMENT OF THE FACTS

On the morning of July 23, 2017, Fire Captain Mike Vasquez of the Tule River Fire Department was part of a response to a "major fire" at the Tule River Tribe's reservation. Vasquez and two other firefighters initially responded to the fire and were later joined by personnel from Tulare County, Amador County, Cal Fire, and the U.S. Forest Service.

Vasquez was wearing his uniform, helmet, boots, and other gear: leather work gloves, a jacket, a small backpack containing water and snacks, and a larger backpack that held two or three lengths of 100-foot firehose weighing 45 to 50 pounds.

Shortly after arriving on the scene, Vasquez saw Aldaco (five feet, four inches tall and weighing 220 pounds), on the slope of a hill trying to extinguish a grass fire by hitting it with a stick or branch, approximately four feet long and the thickness of a baseball bat. Aldaco was frantically screaming "her babies, her babies." Vasquez told Aldaco to get away from the fire for her own safety.

Vasquez assumed the children were in danger and charged up the hill in advance of the crew. It was later discovered that there never were any children present. As Vasquez charged up the hill, laying fire hose, Aldaco charged down the hill and began cussing at Vasquez, telling him he was not doing his job and that she was going to get him fired.

As Vasquez attempted to reason with Aldaco, she got close to him, cussed at him again, and hit him with the four-foot branch. Aldaco hit Vasquez multiple times on the head and then on the back. She then swung at Vasquez's face, but he was able to block the blow with his hand, injuring it. Vasquez had called for assistance once Aldaco began hitting him.

Aldaco then began walking down the hill toward the fire engines. From her position 30 or 40 feet from Vasquez, Aldaco threw the branch up the hill toward Vasquez. He turned his back and ducked, and the branch hit his pack-covered back. Vasquez then saw Aldaco arguing with a fire chief further down the slope.

Daniel Hernandez, a police officer with the Tule River Tribe Police Department, was one of several law enforcement personnel to respond to the scene. Others who arrived

included sheriff's deputies Isidro Ibarra, Justin Thigpin, and Ryan Pugh. Hernandez interviewed Vasquez, and Hernandez and Ibarra then began searching for Aldaco, who was sitting in a grassy area. Ibarra approached Aldaco and told her he needed to speak to her. He ordered her to come his way, but she said she was not going to. Instead, she turned and ran.

After searching for approximately 15 minutes, Hernandez and Ibarra found Aldaco lying in tall grass, attempting to conceal herself and holding a "log." Hernandez, surrounded by the other officers, pointed his firearm at Aldaco and told her repeatedly to drop the log and show her hands, but she refused to comply. Hernandez then attempted to restrain Aldaco while Ibarra attempted to handcuff her, but Aldaco would not comply and kicked Ibarra. Aldaco was eventually handcuffed, but continued to be verbally combative. While officers walked Aldaco down the hill, she remained uncooperative and, at one point, shifted her weight, causing Thigpin to fall and injure his knee.

Aldaco was transported to the Porterville Jail, where she cursed everyone present. Patrol Deputy Kayla Forseth conducted a patdown search of Aldaco. During the search, Aldaco was compliant with her unrestrained hands over her head. But when Forseth attempted to shackle Aldaco's hands, Aldaco resisted and said, "Fuck you, I'm not going to do it." In the process of trying to put Aldaco in a control hold, Aldaco pushed her weight against Forseth and forcefully grabbed her hand. An altercation ensued, but officers were eventually able to force Aldaco onto the ground and shackle her. In the process Forseth's glasses were damaged. Aldaco continued to yell.

## DISCUSSION

I.  COUNT 1—ASSAULT ON A FIREFIGHTER

Aldaco was convicted in Count 1 of a violation of section 245, subdivision (c), which provides, in relevant part:

> "Any person who commits an assault with a deadly weapon or instrument,
> other than a firearm, or by any means likely to produce great bodily injury

4.

upon the person of a peace officer or firefighter, and who knows or reasonably should know that the victim is a peace officer or firefighter engaged in the performance of his or her duties, when the peace officer or firefighter is engaged in the performance of his or her duties, shall be punished .…"

Aldaco contends reversal of Count 1 is required because (1) Vasquez, the victim in Count 1, was not a firefighter as statutorily defined in section 245.1, and (2) there is insufficient evidence that Aldaco used the stick or branch in a manner likely to produce death or great bodily injury. We disagree.

*Definition of a Firefighter under Section 245.1*

Aldaco first contends Vasquez, a fire captain with the Tule River Fire Department, did not come within the statutory definition of firefighter pursuant to section 245.1, and therefore the evidence was insufficient to support the conviction for a violation of section 245, subdivision (c). We disagree.

Although Aldaco argues insufficiency of the evidence, the question of whether Vasquez is a firefighter for purposes of section 245.1, because of who he was working for rather than what he was doing at the time of the incident, appears to us to be a question of statutory interpretation, which we review de novo. (*People v. Gonzales* (2018) 6 Cal.5th 44, 49.) In this situation, our fundamental task is to determine the legislative intent of the statute so as to effectuate the law's purpose. "Because the statutory language is generally the most reliable indicator of that intent, we look first at the words themselves, giving them there usual and ordinary meaning." (*Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1040.) If the statutory language is unambiguous, then its plain meaning controls. If, however, the language supports more than one reasonable construction, then we may look to extrinsic aids, including the ostensible objects to be achieved and the legislative history. (*People v. Ruiz* (2018) 4 Cal.5th 1100, 1105–1106.) With these principles in mind, we begin with the language of the statute.

Section 245.1 provides that, as used in section 245, " 'fireman' or 'firefighter' includes any person who is an officer, employee or member of a fire department or fire

protection or firefighting agency of the federal government, the State of California, a city, county, city and county, district, or other public or municipal corporation or political subdivision of this state, whether this person is a volunteer or partly paid or fully paid." Instructions given defined a firefighter as "includ[ing] anyone who is an officer, employee or member of a governmentally operated fire department in this state, or a federal fire department, whether or not he or she is paid for his or her services."

Vasquez testified he was a fire captain with the "Tule River Fire Department," located in the reservation area. He testified that, at times, he handled fires outside the reservation area because his fire department "have mutual aids [*sic*] with Tulare County and California, or Cal Fire." And, in fact, while Vasquez and two other firefighters initially responded to the fire, they were later joined by personnel from Tulare County, Amador County, Cal Fire, and the U.S. Forest Service.

Aldaco contends the Tule River Tribe is not an agency of the federal government, State of California, city, county, or other listed categories. Aldaco relies on two cases to support her claim that Vasquez does not fit the statutory definition of a firefighter for purposes of section 245. However, both cases are distinguishable. In *People v. Bechler* (1998) 61 Cal.App.4th 373, the court found insufficient evidence that the victims of the assault were acting as firefighters pursuant to section 245.1. However, the court in *Bechler* was addressing the work the victims were doing at the time of the assault—the defendant had fired a rifle at three firefighters who came to his house in response to a reported drug overdose. The firefighters were not engaged in any firefighting duties but, were instead, acting as paramedics or rescue personnel.[2] (*Bechler, supra,* at pp. 376–378.)

---

[2] At the time of the *Bechler* decision, section 245.1 required that, to come within the definition of a firefighter, the individual must be "actually engaged in firefighting, fire supervision, fire suppression, fire prevention, or fire investigation." (Former § 245.1.) That language is no longer included in the current version of section 245.1.

And in *People v. Olsen* (1986) 186 Cal.App.3d 257, on which Aldaco also relies, the court held that a paramedic employed by a private corporation did not fall within the status definition of "emergency rescue personnel," also defined in section 245.1. (*Olsen, supra,* at pp. 262–265.) Neither case is helpful here, and Aldaco provides no additional authority to support her claim.

Where statutory language is clear and unambiguous and serves a rational purpose, there is no need for statutory construction " 'and courts should not indulge in it.' " (*Delaney v. Superior Court* (1990) 50 Cal.3d 785, 800, italics omitted; *People v. Turner* (1995) 40 Cal.App.4th 733, 740, disapproved on other grounds in *People v. Deloza* (1998) 18 Cal.4th 585, 600, fn. 10.) We find the language of section 245.1 clear and unambiguous, and capable of interpretation without resort to statutory construction. The definition of a firefighter "includes" a person who is associated with a fire department or fire protection or firefighting agency of one of the public entities mentioned in section 245.1, regardless of their official job description or how they are compensated, and they are protected under section 245, subdivision (c) if, at the time, they are engaged in the performance of their duties. The word "includes" modifies the clause directly following it, and we are comfortable with the idea that a firefighter employed by the Tule River Fire Department would fit within this definition as well. At the very least, Vasquez was a volunteer firefighter, also covered under the definition of the statute.

### Sufficient Evidence that Aldaco Used the Stick in a Manner Likely to Cause Death or Great Bodily Injury

Section 245, subdivision (c) punishes assaults committed "with a deadly weapon or instrument other than a firearm, or by any means likely to produce great bodily injury …." Aldaco contends the evidence is insufficient to find that she used the stick or branch in a manner likely to cause death or great bodily injury. We disagree.

When considering a challenge to the sufficiency of the evidence to support a judgment, we review the record in the light most favorable to the judgment and decide

whether it contains substantial evidence from which a reasonable finder of fact could make the necessary findings beyond a reasonable doubt. The evidence must be reasonable, credible and of solid value. We presume every inference in support of the judgment that the finder of fact could reasonably have made. We do not reweigh the evidence or reevaluate witness credibility. We cannot reverse the judgment merely because the evidence could be reconciled with a contrary finding. (*People v. D'Arcy* (2010) 48 Cal.4th 257, 293.)

As used in the statute, the term " ' "deadly weapon" is "any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury." ' " (*In re B.M.* (2018) 6 Cal.5th 528, 532–533 (*B.M.*).) Section 245, subdivision (a)(1) contemplates two categories of deadly weapons. Some objects, such as dirks and blackjacks, are deadly weapons as a matter of law because their ordinary use establishes their character as such. (*B.M., supra,* at p. 533.) Other objects, while not deadly per se, may be used in a manner likely to produce death or great bodily injury. (*Ibid.*) Whether an object that is not inherently deadly or dangerous was used as a deadly weapon is a question of fact for the jury. (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028.)

In *B.M.,* our Supreme Court established guidelines for determining whether a non-inherently dangerous object—such as the branch here—was used in a manner likely to produce death or great bodily injury. (*B.M., supra,* 6 Cal.5th at pp. 533–536.) There, 17-year-old B.M. used a three-inch butter knife with a dull tip and serrated edge to scare her sister, Sophia. (*Id.* at p. 531.) When Sophia saw B.M. approaching with the butter knife, she covered herself with a blanket. (*Ibid.*) B.M. made several downward slicing motions with the knife in the area near Sophia's blanketed legs. (*Ibid.*) Although the butter knife made contact with Sophia's legs, the knife neither pierced the blanket nor caused injury to Sophia. (*Ibid.*)

The juvenile court found B.M.'s use of the butter knife violated section 245, subdivision (a)(1), and the court of appeal affirmed. (*B.M., supra,* 6 Cal.5th at p. 530.) Our

Supreme Court reversed, announcing three principles to be applied in such cases. (*Id.* at pp. 530, 533–536.)

"First," the court explained, "the object alleged to be a deadly weapon must be used in a manner that is not only 'capable of producing' but also ' "*likely to produce* death or great bodily injury.' " (*B.M., supra,* 6 Cal.5th at p. 533.) This requires more than a mere possibility that serious injury could have resulted from the object used. (*Ibid.*)

Second, conjecture as to how the object might have been used is not permitted. (*B.M., supra,* 6 Cal.5th at p. 534.) "Rather, the determination of whether an object is a deadly weapon under section 245, subdivision (a)(1) must rest on evidence of how the defendant actually 'used' the object." (*Ibid.*) Although "it is inappropriate to consider how the object could have been used as opposed to how it was actually used," the Supreme Court explained, "it is appropriate in the deadly weapon inquiry to consider *what harm could have resulted from the way the object was actually used.* Analysis of whether the defendant's manner of using the object was likely to produce death or great bodily injury necessarily calls for an assessment of potential harm in light of the evidence. As noted, a mere possibility of serious injury is not enough. But the evidence may show that serious injury was likely, even if it did not come to pass." (*Id.* at p. 535, italics added.)

Third, "limited injury or lack of injury may suggest that the nature of the object or the way it was used was not capable of producing or likely to produce death or serious harm." (*B.M., supra,* 6 Cal.5th at p. 535.) However, an aggravated assault conviction does not require proof of any injury or even physical contact. (*Ibid.*)

Applying these principles, we conclude that substantial evidence supports the conclusion that Aldaco used the branch as a deadly weapon in a manner likely to produce great bodily injury under section 245, subdivision (c).

We first note that Aldaco does not contest that the branch was capable of causing death or great bodily injury by its nature. The branch was described by Vasquez as four feet long, the width of a baseball bat, and that it traveled approximately 30 to 40 feet when

9.

thrown by the 220-pound Aldaco. As Vasquez first attempted to reason with Aldaco, she hit him multiple times on his head, using downward swings with her hands from around the height of her head. While Vasquez felt the blows to his head, he testified that it did not "phase" him because he was wearing his helmet. Aldaco also hit Vasquez on the back, which did not injure him due to the thickness of the hose pack he had on his back. Aldaco then made an "upper cut" swing with the branch at Vasquez's face, which was unprotected. Vasquez was able to block the blow with his hand, which "instantly" hurt, swelled up, "got tight," and turned red. Although Vasquez's hand continued to hurt, he did not stop work, given the need to quickly "catch" the fire. Aldaco's swings at Vasquez's head, back and face lasted approximately 90 seconds.

Aldaco then walked further down the hill toward the fire engines. From her position 30 to 40 feet lower on the hill, Aldaco then threw the branch back up the hill toward Vasquez. Realizing that the branch was about to hit him, Vasquez turned his back and ducked, causing the branch to hit his pack-covered back.

Aldaco argues that none of her attempts with the branch were used in a manner likely to cause great bodily injury, noting Vasquez's helmet covered head, back-pack covered back, the fact that Vasquez was able to deflect the swing to his face, and the fact that the branch was not sharp.[3] However, "the evidence may show that serious injury was likely, even if it did not come to pass." (*B.M., supra,* 6 Cal.5th at p. 535.) Thus, we may consider the injuries that likely would have resulted from the way Aldaco actually used the branch. (*Ibid.*)

On the record before us, as chronicled above, the jury could reasonably infer that, but for his defensive maneuvers, Vasquez would have been hit, resulting in serious bodily injury

---

**3** Aldaco also seems to rely on the dismissal of the great bodily injury enhancement attached to Count 1. However, that enhancement dealt with actual great bodily injury rather than the requirement here, that the branch was used in a manner likely to cause great bodily injury. (See § 12022.7, subd. (a).)

or death. As the Supreme Court observed in *B.M.*, "an aggressor should not receive the benefit of a potential victim fortuitously taking a defensive measure or being removed from harm's way once an assault is already underway." (*B.M., supra,* 6 Cal.5th at p. 537; see *People v. Koback* (2019) 36 Cal.App.5th 912, 925 [substantial evidence supported finding the defendant used car keys in a manner capable of causing and likely to result in great bodily injury, though keys did not make contact with anyone].) From the way Aldaco swung and threw the branch, we conclude Vasquez would have likely suffered serious bodily injury had he not succeeded in deflecting the branch and turning his back. Therefore, the evidence supports the conclusion that Aldaco used the branch in a manner that was both capable of producing and likely to produce serious bodily injury. (*B.M., supra,* at pp. 534–535.) We therefore reject the claim of error.

## II. COUNT 6—RESISTING AN EXECUTIVE OFFICER

Aldaco was convicted in Count 6 of a violation of section 69, which provides, in relevant part:

> "(a) Every person who attempts, by means of any threat or violence, to deter or prevent an executive officer from performing any duty imposed upon the officer by law, or who knowingly resists, by use of force of violence, the officer, in the performance of his or her duty, is punishable .…"

Aldaco contends Hernandez, the officer at issue, was not an "executive officer" within the meaning of section 69, requiring reversal of Count 6 for insufficiency of the evidence. We disagree.

Hernandez testified he was an officer with the Tule River Tribe Police Department, who had attended the COS Hanford Police Academy and received federal police officer training. One of Hernandez's main duties was "controlling the high country reservation." His major duties also included "respond[ing] to various calls and work[ing] with the Tulare County Sheriff's Department if needed." If a crime occurred on the reservation, Hernandez would contact the Sheriff's Department.

11.

While the term "executive officer" is not defined by statute, numerous cases have broadly construed the term. The term "executive officer" has long included police officers or deputy sheriffs (*People v. Williams* (1999) 72 Cal.App.4th 1460, 1463, fn. 5; *In re Manuel G.* (1997) 16 Cal.4th 805, 818–819), but has also has been found to include the mayor of a city (*People v. Superior Court (Anderson)* (1984) 151 Cal.App.3d 893, 895); a junior epidemiologist-bacteriologist employed by the State Board of Health to perform inspections of aviaries (*People v. Kerns* (1935) 9 Cal.App.2d 72, 73–75); a chief deputy coroner (*People v. Strohl* (1976) 57 Cal.App.3d 347, 361); and the president of the board of police commissioners, city attorney, and executive assistant city attorney (*People v. Hallner* (1954) 43 Cal.2d 715, 717–721).

Aldaco notes that CALCRIM No. 2652, which was given here, instructed that:

> "A police officer is an executive officer. [¶] A sworn member of the Tulare County Sheriff's Office and/or Tule River Tribal Police, authorized by 830 et seq. is a peace officer." (Italics omitted.)

Aldaco contends that a Tule River Peace Officer is not a peace officer under section 830, citing *People v. Pennington* (2017) 3 Cal.5th 786 (*Pennington*), and therefore not an executive officer under section 69.[4]

However, we do not find *Pennington* supports Aldaco's claim. In *Pennington,* the court held that the People had failed to prove that a member of the Santa Barbara City Harbor Patrol was a peace officer under section 830. (*Pennington, supra,* 3 Cal.5th at p. 788.) The defendant was charged with two violations involving the same harbor patrol officer: a violation of section 69, as well as misdemeanor battery on a police officer (§ 243, subd. (b)). (*Pennington, supra,* at p. 789.) The court in *Pennington* found the harbor patrol officer did not fit within the definition of police officer for purposes of section 830, and reversed the conviction for battery on a police officer. However, the court did not reverse

---

[4] We note that Aldaco did not contest the instruction as given.

the conviction under section 69, presumably finding that the harbor patrol officer was an executive officer.  (*Pennington, supra,* at pp. 800–801.)

Here, as argued by the People, even if Hernandez was not a peace officer within the meaning of section 830, there was sufficient evidence that he was an "executive officer" within the meaning of section 69.  We agree.

CALCRIM No. 2652, which was given here, defines an executive officer, in part, as a "government official who may use his or her own discretion in performing his or her job duties."

Hernandez testified that his duties included "controlling the high country reservation," responding to various calls for service, and working with the Tulare County Sheriff's Department, when needed.  Responding to calls for service and working with another agency necessarily implicates the use of discretion.

On the date of the incident, Hernandez was dispatched to the reservation as a secondary officer to meet Tulare County Sheriff's Department deputies and escort them to a residence.  After he did so, Hernandez, unaccompanied by other detectives, interviewed Vasquez for 10 to 15 minutes and obtained a statement in connection with the investigation.

Hernandez and other law enforcement then began searching for Aldaco in the mountainous areas of the reservation.  When Hernandez, along with Deputy Ibarra, found Aldaco in the grass, Hernandez drew his firearm and gave commands to Aldaco.  Hernandez and Ibarra ultimately detained and handcuffed Aldaco.  Aldaco does not contest that she resisted Hernandez and Ibarra.

Hernandez himself conducted an interview of Vasquez to identify Aldaco as the suspect.  He searched the reservation area to find Aldaco, acting independently and outside radio contact with other officers.  When Hernandez found Aldaco, he drew his firearm, initiated commands to Aldaco, and used his discretion to assist Ibarra in arresting Aldaco.  Contrary to Aldaco's claim to the contrary, Hernandez exercised discretion in performing

13.

his work and there was sufficient evidence to support the finding that he was an executive officer within the meaning of section 69.

## III. COUNT 7—ILLEGAL CONDUCT AT A FIRE

Aldaco next contends there is insufficient evidence to uphold her conviction for misdemeanor illegal conduct at a burning location (§ 148.2). We disagree.

The jury was instructed on the elements of section 148.2 using the verbatim language of the statute, which provides:

> "Every person who willfully commits any of the following acts at the burning of a building or at any time and place where any fireman or firemen or emergency rescue personnel are discharging or attempting to discharge an official duty, is guilty of a misdemeanor: [¶] 1. Resists or interferes with the lawful efforts of any fireman or firemen or emergency rescue personnel in the discharge or attempt to discharge an official duty. [¶] 2. Disobeys the lawful orders of any fireman or public officer. [¶] 3. Engages in any disorderly conduct which delays or prevents a fire from being timely extinguished. [¶] 4. Forbids or prevents others from assisting in extinguishing a fire or exhorts another person, as to whom he has no legal right or obligation to protect or control, from assisting in extinguishing a fire." (§ 148.2).

The prosecution's theory was that the section 148.2 offense related to Fire Captain Vasquez.

The statutory definition of a firefighter under section 245.1 also applies to a violation of section 148.2. (§ 245.1.) Aldaco's claim on appeal is that, because Vasquez was not a firefighter as statutorily defined under section 245.1, there is insufficient evidence to uphold her conviction under section 148.2. However, we have determined, in part I. above, that Vasquez was a firefighter under the definition of section 245.1, and therefore reject Aldaco's claim here as well.

## IV. FAILURE TO GIVE CALCRIM NO. 355, DEFENDANT'S RIGHT NOT TO TESTIFY

Aldaco contends that the trial court erred when it failed to give CALCRIM No. 355, regarding a defendant's right not to testify. The instruction provides:

> "A defendant has an absolute constitutional right not to testify. He or she may rely on the state of the evidence and argue that the People have failed to prove

14.

the charges beyond a reasonable doubt. Do not consider, for any reason at all, the fact that the defendant did not testify. Do not discuss that fact during your deliberations or let it influence your decision in any way." (CALCRIM No. 355.)

Aldaco did not request that the instruction be given. Although the reporter's transcript indicates the prosecution requested the instruction, it was apparently overlooked and not given. We conclude that the trial court did not err because Aldaco failed to request the instruction. We further conclude that even if there were error, it would be harmless.

*Applicable Law and Analysis*

Upon a defendant's request, a trial court must "instruct the jury not to draw an adverse inference from the defendant's failure to take the stand." (*People v. Evans* (1998) 62 Cal.App.4th 186, 190 (*Evans*), citing *Carter v. Kentucky* (1981) 450 U.S. 288, 300, 305.) Absent a defendant's request, a trial court has no duty to give such an instruction. (*People v. Lewis* (1990) 50 Cal.3d 262, 282 [rejecting the defendant's claim of error based on "the well-established California rule that instructions against adverse inferences from a defendant's failure to testify need only be given upon his request"].) Here, Aldaco failed to request CALCRIM No. 355.

In her reply brief, Aldaco contends we should overlook counsel's failure to request the instruction because counsel was relying on the prosecutor's request. Aldaco, however, points to nothing in the record that would support this contention, other than defense counsel's silence. Furthermore, defense counsel made no objection when the instruction was subsequently not given. We therefore find that the trial court did not err when it failed to give the instruction.

Even if we were to find error by failing to give CALCRIM No. 355, we find the error harmless under *Chapman v. California* (1967) 386 U.S. 18, 24. (*Evans, supra,* 62 Cal.App.4th at p. 197.) In reaching this conclusion, we look to the instructions given, which we find conveyed much of the substance of the omitted instruction. (See *U.S. v. Castaneda* (9th Cir. 1996) 94 F.3d 592, 596.) Here, the jurors were instructed thoroughly on the

15.

applicable constitutional principles, including the presumption of innocence, the prosecution's burden of proof, and Aldaco's lack of any burden. The trial court clearly instructed the jury, both at the beginning of trial and prior to deliberation, that the People bore the burden to prove Aldaco's guilt as to each charge, and to prove all sentencing allegations, beyond a reasonable doubt. The trial court also instructed the jury at the beginning of trial and prior to deliberation that the charges against Aldaco or her arrest were not indicative of guilt, and that she was presumed innocent, did not have to prove she was not guilty, was not required to present evidence, and was not required to call witnesses.

In closing, the prosecutor also advised the jury on its burden of proof. Aldaco's counsel raised the presumption of innocence and burden of proof in opening statements as well. Neither party commented on Aldaco's decision not to testify, either in opening remarks or closing statements.

Moreover, the prosecution's evidence against Aldaco was overwhelming. Identity or an alibi were not at issue at trial. Instead, much of Aldaco's conduct was video recorded, and there was no dispute as to Aldaco's involvement. The evidence on the counts of conviction consisted of uncontroverted witness testimony.

In light of the instructions given and the strength of the evidence against Aldaco, had the trial court erred in failing to give CALCRIM No. 355, any error would have been harmless beyond a reasonable doubt.

## V.  PRIOR STRIKE AND SERIOUS FELONY CONVICTION

The information alleged Aldaco suffered a 2006 conviction for discharging a firearm in a grossly negligent manner (§ 246.3), which qualified as a "strike" as a prior serious or violent felony (§§ 667, subds. (b)–(i); 1170.12, subds. (a)–(d)), and also as a prior serious felony (§ 667, subd. (a)(1)). Aldaco waived her right to a jury trial on the allegations. In a bifurcated proceeding, the trial court found the allegations of both the prior strike and prior serious felony true. Aldaco did not object to this finding.

At sentencing, the trial court subsequently granted Aldaco's *Romero*[5] motion as to the strike. As a result, the trial court did not sentence Aldaco on the prior strike, but it did impose a five-year enhancement, pursuant to section 667, subdivision (a)(1), stating it did not have discretion not to impose the five-year sentence.

Aldaco contends the trial court engaged in improper factfinding when it found the prior section 246.3 conviction qualified as a strike and a prior serious felony. In a related argument, she contends insufficient evidence supports the trial court's finding that the prior conviction qualified as a strike or qualified for a prior serious felony enhancement, since there was no evidence that she personally used the firearm.

The People do not appear to disagree that the trial court engaged in improper factfinding or that insufficient evidence supports the strike or serious felony findings. Instead, they claim the issues are moot, waived or forfeited, and any error harmless.

While we agree that Aldaco has waived her argument that the trial court engaged in impermissible judicial factfinding beyond the elements of the section 246.3 offense in violation of her Sixth Amendment rights, we conclude substantial evidence does not support the trial court's findings on the prior 2006 conviction. Aldaco was not sentenced on the strike prior and therefore the issue is moot on that issue. However, Aldaco received the five-year enhancement, so the issue is not moot as to the section 667, subdivision (a) serious felony five-year enhancement, based on the same 2006 section 246.3 conviction. We therefore strike the five-year enhancement based on lack of substantial evidence to support that finding.

*Applicable Law and Analysis*

Aldaco contends the trial court's finding that she committed the strike version of section 246.3 constituted improper factfinding in violation of her Sixth Amendment right to a jury trial under *People v. Gallardo* (2017) 4 Cal.5th 120 (*Gallardo*). We agree.

---

[5] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

17.

However, we conclude Aldaco forfeited this claim because she did not timely object to the court's factual determination on Sixth Amendment grounds. At the time of the trial on the prior, *Gallardo* had been decided. Aldaco therefore could have, but did not, raise an objection under *Gallardo*.

However, she presents a meritorious claim of insufficient evidence to uphold the finding on her prior conviction as a prior serious felony. Aldaco contends the evidence was insufficient for the trial court to conclude her prior 2006 conviction for negligent discharge of a firearm (§ 246.3) was a qualifying serious felony under section 667, subdivision (a). Aldaco merely pled guilty to the prior conviction, and there was no admission or evidence that her prior conviction was based on personal discharge of a firearm, as opposed to aider and abettor culpability, so as to qualify as a "serious felony."

To qualify as a section 667, subdivision (a) "serious felony," the prior conviction must be a "serious felony" as defined in section 1192.7 (§§ 667, subd. (d), 1170.12, subd. (b).) Section 246.3 is not a felony specifically listed in section 667.5 or section 1192.7. Section 246.3 can be used as a serious felony only if defendant personally used the firearm. (§ 1192.7, subd. (c)(8) ["any felony in which the defendant personally uses a firearm"]; § 1192.7, subd. (c)(23) ["any felony in which defendant personally used a dangerous or deadly weapon"]; see also, *People v. Bautista* (2005) 125 Cal.App.4th 646, 654–655 [it was error not to submit to the trier of fact the question whether the defendant's prior section 246.3 conviction included personal use of the firearm by the defendant so as to qualify for a section 667 enhancement].

Here, the trial court determined Aldaco's 2006 conviction for a violation of section 246.3 was a serious felony after examining Exhibit 26, which consisted of a copy of the information charging Aldaco with a violation of section 246.3, and the minute order from the sentencing hearing, which indicates a plea agreement on that charge. The record shows only that Aldaco was convicted of a section 246.3 violation. The prior conviction may have been based on vicarious liability as an aider and abettor, since there is no evidence or

18.

admission that she personally discharged the firearm.  This constitutes insufficient evidence to uphold her section 246.3 conviction as a section 667, subdivision (a) prior serious felony.

The People implicitly acknowledge the lack of evidence that defendant personally used the firearm in the 2006 conviction.  The documents submitted by the prosecution did not show Aldaco personally discharged the firearm.  Thus, there was no admission or evidence of personal use of a firearm that would qualify Aldaco's 2016 conviction as a serious felony under section 667, subdivision (a).  Accordingly, no substantial evidence supports using the prior section 246.3 conviction as a serious felony for the section 667, subdivision (a) enhancement.

Since the prior strike conviction was struck by the *Romero* motion, and the People are not contesting that finding, we need not remand for resentencing on that issue.  However, we remand with directions to strike the prior serious felony pursuant to section 667, subdivision (a) and resentence Aldaco accordingly.  Because we do so, we need not address the parties next contention that we remand to allow the trial court discretion whether the strike the five-year section 667, subdivision (a)(1) enhancement, pursuant to newly enacted Senate Bill 1393 which, effective January 1, 2019, amended sections 667, subdivision (a) and 1385, subdivision (b) to allow a court to exercise its discretion to strike or dismiss a prior serious felony conviction for sentencing purposes.  (Stats. 2018, ch. 1013, §§ 1–2.)

VI.    DEADLY WEAPON ENHANCEMENT

Finally, Aldaco contends that the section 12022, subdivision (b)(1) weapon enhancement imposed on Count 1 must be dismissed because her conduct during the commission of the assault offense rendered the use of a deadly weapon an element of the conviction.  Respondent concedes the issue, and we accept the concession.

*Background*

Aldaco was charged in count 1 with "an assault with a deadly weapon and instrument and by force likely to produce great bodily injury," pursuant to section 245, subdivision (c).

The count further alleged that Aldaco used a deadly and dangerous weapon, to wit, a "WOODEN OBJECT, said use not being an element of the above offense," pursuant to section 12022, subdivision (b)(1).

The trial court instructed the jury that, in order to find Aldaco guilty of the substantive offense, it had to find, inter alia, that Aldaco "did an act with a deadly weapon that by its nature would directly and probably result in the application of force to a person."

The jury found Aldaco guilty of count 1 and found that the related special allegation of personal use of a deadly weapon, alleged pursuant to section 12022, subdivision (b)(1) true. At sentencing, the trial court stayed the sentence on the enhancement.

*Applicable Law and Analysis*

Section 12022, subdivision (b)(1) states in pertinent part: "A person who personally uses a deadly or dangerous weapon in the commission of a felony … shall be punished by an additional and consecutive term of imprisonment in the state prison for one year, *unless use of a deadly or dangerous weapon is an element of that offense.*" (Italics added.)

Where use of a deadly weapon other than a firearm is the sole means by which a defendant violates section 245, use of the weapon is an element of the offense. (*People v. McGee* (1993) 15 Cal.App.4th 107, 114–115; see *People v. Memory* (2010) 182 Cal.App.4th 835, 838, fn. 1; *People v. Summersville* (1995) 34 Cal.App.4th 1062, 1070.)

Here, the assault on Vasquez consisted of blows to the head, back and face with a stick or branch. Thus, Aldaco's use of a deadly weapon, the "wooden object," was the sole means by which he violated section 245, subdivision (c).

Pursuant to the terms of section 12022, subdivision (b)(1), Aldaco's use of a deadly weapon was an element of the offense of which she was convicted. Respondent concedes as much and echoes Aldaco's request that we strike the section 12022, subdivision (b)(1) enhancement attached to Count 1. We agree and do so here.

## DISPOSITION

The trial court shall strike the section 667, subdivision (a)(1) five-year enhancement and the previously stayed section 12022, subdivision (b)(1) enhancement attached to Count 1. After resentencing, a corrected abstract of judgment shall be forwarded to the appropriate authorities. In all other respects, the judgment is affirmed.

FRANSON, J.

WE CONCUR:

DETJEN, Acting P.J.

PEÑA, J.

21.