Filed 11/5/25  P. v. Porter CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>THEODORE PORTER,<br><br>     Defendant and Appellant. | H051984<br>(Santa Cruz County<br>Super. Ct. No. 22CR01960) |

In May 2022, after an altercation outside of a bar in downtown Santa Cruz, Theodore Porter was charged with assault with a deadly weapon in violation of Penal Code section 245, subd. (a)(1), with a special allegation that he inflicted great bodily injury in violation of Penal Code section 12022.7, subd. (a).  (Subsequent undesignated statutory references are to the Penal Code.)  A jury found that Porter was guilty of assault with a deadly weapon but the special allegation was not true.  On appeal, Porter challenges his conviction on the grounds that there was insufficient evidence that he used his weapon—a bamboo pole—as a deadly weapon.  Porter also asserts that the prosecutor engaged in misconduct during closing arguments.  For the reasons explained below, we disagree and affirm the judgment.

# I. BACKGROUND

## A. The Underlying Incident

On May 11, 2022, Mario Ramirez visited bars in downtown Santa Cruz and, after drinking for several hours, admittedly became "pretty drunk." Around 8:00 p.m., Ramirez went to another bar, but the bartender deemed him too intoxicated to serve alcohol. After the bartender gave him a glass of water, Ramirez left the bar.

Porter was outside of the bar with a friend, Joseph Taylor III. Outside the bar Ramirez began talking and eventually arguing with a group including Taylor, and Ramirez apparently kicked Taylor or Taylor's boots. In response, Porter began swinging and gesturing with a bamboo pole that he had with him. After a few moments, an unidentified teenager arrived, and the youth punched Ramirez in the face multiple times.

Porter joined in. He approached Ramirez with his bamboo pole and swung the pole, hitting Ramirez at least twice. The police arrived shortly afterwards and found Ramirez with a substantial amount of blood on his face and a laceration on his skull two to three inches long that required at least six staples to close.

## B. The Proceedings Below

The next day Porter was charged with one count of assault with a deadly weapon. In addition, the complaint alleged that Porter inflicted great bodily injury. Following unsuccessful attempts at mental health diversion, Porter was found mentally incompetent and committed to a state hospital. Porter regained competency in December 2023, and his trial commenced two months later.

### 1. *The Prosecution's Case*

At trial, the prosecutor presented testimony from the bartender who refused to serve Ramirez, another eyewitness, the responding police officers, and Ramirez.

The bartender testified that, after Ramirez left the bar, she saw Porter outside, holding an approximately eight-foot-long bamboo pole. In addition to yelling at

2

Ramirez, Porter was swinging the pole, moving it in a manner "like those in kung fu movies," and thrusting it toward Ramirez.

Shortly thereafter, a younger man approached Ramirez and start "throwing punches" at him. The youth hit Ramirez four or five times on his face, hard enough that Ramirez stumbled back. At that point Porter ran up and, according to the bartender, whacked Ramirez in the head with the bamboo pole. According to the bartender, the blow was loud enough that she could hear the crack inside the bar.

The assistant manager at a nearby store corroborated much of the bartender's testimony. The assistant manager testified that he saw Porter spinning a stick around his head and jabbing the stick at someone, striking poses, and "doing his kung fu master thing." The assistant manager also testified that Porter was spitting and yelling at Ramirez. However, the assistant manager did not see what happened next because Porter passed out of his line of vision.

The police, whom the bartender had called after the youth began punching Ramirez, arrived shortly afterwards. The police found Porter holding the bamboo pole and yelling in Ramirez's direction. Porter told the police that Ramirez had kicked Taylor's things and threatened him. Porter also said that he had kept Ramirez away with his stick but had not hit him, and that an unidentified "youngster" had punched Ramirez, causing his injuries. For his part, Taylor told the police that Ramirez had kicked his boots, and that "the kid" hit Ramirez, but that Porter had not used the stick or touched Ramirez.

The police also found Ramirez holding a metal chain in one hand. There was a substantial amount of blood on Ramirez's face, and he appeared to be bleeding from his scalp. Ramirez, who was heavily intoxicated, was unsure what had happened or how he sustained his injuries.

Ramirez testified that he did not recall anyone punching him but remembered getting hit on the head with the stick. However, Ramirez was unable to identify who hit

3

him with the stick. Ramirez also testified that he was transported to the hospital, where he received six or eight staples on his head.

Finally, the prosecutor presented surveillance footage. Because the footage apparently was from an officer's cell phone recording of the original surveillance video, the quality was poor, and the jury had difficulty making out details. However, the footage showed Porter moving the bamboo pole in the manner described by the bartender and assistant manager, Ramirez being punched by the youth, and Porter swinging the pole at Ramirez.

### 2. The Defense's Case

Porter testified that he had a bamboo pole, which he described as hollow and very lightweight, that he used as a walking stick. He also testified that on the night of the incident he took the pole with him to downtown Santa Cruz. According to Porter, he and Taylor were outside the bar when Ramirez exited the bar, kicked Taylor, and started kicking Taylor's boot down the street. Porter said that he told Ramirez to leave Taylor alone, called Ramirez a "bitch," and spat on the ground. According to Porter, Ramirez responded that he had a gun and was going to kill them, so Porter "got loud" in an effort to attract attention and prevent Ramirez from shooting. Concerned for his and Taylor's safety, Porter testified that he began "doing [his] kung fu thing" with the bamboo pole, including jabbing and thrusting it toward Ramirez. Ramirez then pulled a chain out his jacket, wrapped around his hand.

A short time later, a teenager arrived. Porter testified that he told the youth that Ramirez had hit Taylor and would not leave them alone. The teenager approached Ramirez and punched him several times. Then, Porter testified, because he was concerned for the teenager's safety, he used his bamboo pole to hit Ramirez twice: once on his hand that was holding the chain and then on the other side on his arm. He testified that you could hear a "crack" when the pole hit the chain. Porter then walked away from Ramirez and high-fived the teenager.

4

Taylor testified that on the night of the incident he and Porter had been sitting on the street near the bar. After exiting the bar, Ramirez shouted at Taylor, kicked his foot, and threatened to shoot him. Taylor also testified that Ramirez retrieved a chain from his car and started hitting a nearby railing. According to Taylor, Porter told Ramirez to leave Taylor alone, and Ramirez began to leave. However, a teenager arrived, kicked Ramirez, and then hit him. Taylor testified as well that Porter waved his pole around, but Taylor said that Porter did not hit Ramirez.

The defense also presented "clarified" and "enhanced" versions of the video footage submitted by the prosecutor.

### 3. *The Prosecutor's Closing Arguments*

During closing argument, the prosecutor began with a story about hunting for an apartment and seeing pretty flowers growing through a grate, only to discover that the flowers hid exposed plumbing and zip-corded electrical wires. The prosecutor said that Porter's defense similarly was "something pretty to hide an ugly truth underneath." When Porter and Taylor spoke with police on the night of the incident, the prosecutor continued, neither mentioned that Ramirez had kicked Taylor rather than his stuff, and both told the police that Porter had not hit Ramirez with the bamboo pole. However, surveillance footage showed Porter hitting Ramirez twice with the pole, and, according to the prosecutor, Porter's testimony in court was "artfully crafted" to admit that he hit Ramirez with the pole but to assert that he did so to defend Taylor and the teenager. Porter objected to this argument but was overruled.

Later in closing argument, the prosecutor asked rhetorically, "[i]s [Porter's] testimony influenced by a factor such as bias," and he answered, "[a]bsolutely. He is the defendant. He is trying to explain away a very bad situation." Porter objected to this argument as well, but again was overruled. The prosecutor also added that Porter's testimony was not reasonable, and characterized Porter's statements to police that he had not touched Ramirez as "obviously lies." By contrast, the prosecutor asserted that video

5

evidence "100 percent corroborate[d]" the assistant manager's testimony and that the bartender had "[n]o bias whatsoever" and "[n]o reason to lie whatsoever."

In arguing that the bamboo pole was a deadly weapon, the prosecutor made another a comparison. He stated, "this is just a bamboo pole. It's not that heavy. But remember that a baseball bat is not very heavy either, and you can do a lot with a baseball bat." Porter objected, but this objection was overruled as well. Then, noting that the "[p]rinciple of leverage—that you can get the tip moving really fast"—is the reason that poles "are used in kung fu movies as martial arts weapons," the prosecutor asserted that a bamboo pole is "absolutely capable of inflicting great bodily injury, whether you thrust it into someone or whether you crack them over the head with it and split their head open," and therefore it is a "dangerous or deadly weapon."

### 4. Conviction and Sentencing

The trial court instructed the jury on both assault with a deadly weapon and the lesser included offense of simple assault. The jury convicted Porter of assault with a deadly weapon. However, the jury also found that he had not inflicted great bodily injury.

The trial court sentenced Porter to the low term of two years in prison, awarded a credit of 777 days for time served, and ordered him to report to parole. After sentencing, Porter filed a timely notice of appeal.

## II. DISCUSSION

### A. Sufficiency of the Evidence

Porter argues that his conviction for assault with a deadly weapon should be reduced to simple assault because the jury lacked sufficient evidence that he used his bamboo pole—an object that is not inherently deadly or dangerous—as a deadly weapon. For the reasons explained below, we disagree.

## 1. Standard of Review

In reviewing sufficiency of the evidence, a reviewing court is not to reweigh the evidence because "the credibility of witnesses and the weight to be accorded to the evidence are matters exclusively within the province of the trier of fact." (*People v. McCleod* (1997) 55 Cal.App.4th 1205, 1221.) Instead, reviewing courts examine whether substantial evidence—evidence " 'of ponderable legal significance . . . reasonable in nature, credible, and of solid value' " (*People v. Jonson* (1980) 26 Cal.3d 557, 576)—supports the jury's findings. (*People v. Crittenden* (1994) 9 Cal.4th 83, 139; see also *People v. Harris* (2013) 57 Cal.4th 804, 849-850.) In so doing, courts review the evidence in the record "in the light most favorable to the prosecution and presume . . . the existence of every fact the jury could reasonably have deduced from the evidence" in order to determine whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

## 2. Deadly Weapon

Under the Penal Code, the offense of assault with a deadly weapon is "an assault upon the person of another with a deadly weapon or instrument other than a firearm." (§ 245, subd. (a)(1).) For purposes of this offense, "a 'deadly weapon' is 'any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury.' " (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028–1029 (*Aguilar*).) Some objects are deadly weapons as a matter of law, while others become deadly weapons because of how they are used. Weapons are deadly as a matter of law based on "the ordinary use for which they are designed." (*Id.* at p. 1029.) As the crime of assault with a deadly weapon does not involve firearms (§ 245, subd. (a)(1)), the Supreme Court has given the "dirk"—a "long straight-bladed dagger" or "short sword" designed for thrusting used by Scottish highlanders and junior British naval officers (Webster's 3d New Internat. Dict. (1993) p. 642, col. 1; see also § 16470 [noting that a "dirk" is "capable of ready use as a stabbing weapon"])—as an example of

a deadly weapon as a matter of law.  (*Aguilar*, at p. 1029; *People v. Graham* (1969) 71 Cal.2d 303, 327, disapproved on other grounds in *People v. v. Ray* (1975) 14 Cal.3d 20, 32.)  "Other objects, while not deadly per se," may qualify as deadly weapons if used "in a manner likely to produce death or great bodily injury."  (*Aguilar*, at p. 1029.)  Thus, if used in a manner likely to produce death or great bodily injury, a screwdriver, a beer bottle, a car, and even a car key may become a deadly weapon.  (See, e.g., *People v. Perez* (2018) 4 Cal.5th 1055, 1065 [car]; *People v. Koback* (2019) 36 Cal.App.5th 912, 924-926 [car keys]; *People v. Simons* (1996) 42 Cal.App.4th 1100, 1107 [screwdriver]; *People v. Cordero* (1949) 92 Cal.App.2d 196, 199 [beer bottle].)

In determining whether an object that is not inherently deadly or dangerous is being used a deadly weapon, "the nature of the object, the manner in which it is used, and all other facts relevant to the issue" may be considered.  (*Aguilar*, *supra*, 16 Cal.4th at p. 1029.)

### 3.  *Analysis*

Although a bamboo pole is not a deadly weapon per se, it may be used in such a way that it becomes one, and in this case there is substantial evidence of such use.

A wide variety of sticks, poles, and similar instruments have been found, based on their usage, to be dangerous or deadly weapons.  Defendants have been convicted of assault with a deadly weapon based on use of a wooden stick "18 to 20 inches long" (*People v. Jaramillo* (1979) 98 Cal.App.3d 830, 835, 837), an axe handle (*People v. Townsend* (1971) 20 Cal.App.3d 919, 922), a fence post (*People v. Morlock* (1956) 46 Cal.2d 141, 146), a pencil (*People v. Page* (2004) 123 Cal.App.4th 1466, 1472), and even a salami (*People v. Hopkins* (1975) 44 Cal.App.3d 669, 676).  Most pertinently, a defendant also has been convicted of assault with a deadly weapon based on the use of a four-foot-long bamboo pole.  (*People v. Dryden* (2021) 60 Cal.App.5th 1007, 1014-1016.)

There is substantial evidence in the record that Porter used his bamboo pole as a deadly weapon. Porter's pole was eight-feet-long. That is twice the length of the pole previously found to be a deadly weapon, and, as the prosecutor observed, this greater length increased the leverage generated by Porter's pole. In addition, as the videos of the incident show, far from merely tapping Ramirez with the pole, Porter held the pole with both hands, drew it back, and swung. Indeed, Porter swung with such force that when the pole hit Ramirez's hand holding the chain it produced a "crack" so loud that it was heard inside the bar. In addition, when police officers arrived, Ramirez's face was "covered in blood," and he had a two- to three-inch-laceration on his scalp that required six or eight staples to close. Moreover, Porter did not present evidence that something besides his pole caused this injury. As a consequence, the jury had reasonable, credible, and solid grounds for finding that Ramirez wielded his bamboo pool in a manner likely to cause great bodily injury.

Porter contends that the jury's finding concerning the dangerousness of his pole is contradicted by the video footage, which in his view shows that Porter struck Ramirez on his waist, not his head. While this is not an unreasonable interpretation of the footage, the footage was of poor quality and taken from an angle that makes it difficult to determine exactly where Porter struck Ramirez. In particular, the end of the pole might have hit Ramirez somewhere above his chest. Moreover, Ramirez testified that he was hit on his head, and the bartender supported Ramirez's account, testifying both before and after seeing the surveillance footage that she saw Porter strike Ramirez on the head. Consequently, the video footage did not prevent the jury from finding that Porter caused Ramirez's injury by hitting him on the head with a bamboo pole.

Porter also argues that, because the jury found he had not inflicted great bodily injury, he could not have used the bamboo pole as a deadly weapon. This argument fails for three reasons. First, as the instructions expressly recognized, the jury was not required to find that Porter inflicted great bodily injury in order to find him guilty of

9

assault with a deadly weapon. (See *Aguilar*, *supra*, 16 Cal.4th at p. 1028 ["because the statute focuses on *use* of a deadly weapon or instrument or, alternatively, on force *likely* to produce a great bodily injury, whether the victim in fact suffers any harm is immaterial"].) Second, even if the jury did not find that Porter hit Ramirez on his head, it could have found that he used the pole as a deadly weapon based on the nature of his bamboo pole and the force with which he swung the pole. Indeed, if Porter's blow with the pole produced a crack when it hit the chain held by Ramirez so loud that it could be heard inside the bar, the jury could have found that absent the chain the blow might have shattered Ramirez's hand or wrist.

Third, even if the jury's findings that Porter used his bamboo pole as a deadly weapon were inconsistent with rejection of the great bodily injury enhancement, the verdict against Porter would not need to be vacated because of that inconsistency. A jury need not render consistent verdicts "so long as substantial evidence supports the offenses convicted upon." (*People v. Ramirez* (2022) 13 Cal.5th 997, 1121-1122; see also *id*. at p. 1122 [" 'The law generally accepts inconsistent verdicts as an occasionally inevitable, if not entirely satisfying, consequence of a criminal justice system that gives defendants the benefit of a reasonable doubt as to guilt, and juries the power to acquit whatever the evidence.' [Citation]."].) Here, as discussed above, substantial evidence supports the jury's finding of assault with a deadly weapon based on the manner and force with which Porter wielded his bamboo pole as well as Ramirez's resulting injuries.

In sum, we conclude that the jury's not true finding regarding infliction of great bodily injury does not preclude Porter's conviction for assault with a deadly weapon and that the conviction is supported by substantial evidence.

## B. Prosecutorial Misconduct

In addition to challenging the sufficiency of the evidence presented, Porter argues that the prosecutor committed misconduct during closing argument. In particular, he

10

contends that the prosecutor commented impermissibly on Porter's credibility and improperly referred to facts not in evidence. We reject both arguments.

### 1. *Prosecutorial Misconduct*

Prosecutors are " ' "given wide latitude" ' " in closing argument. (*People v. Peoples* (2016) 62 Cal.4th 718, 796 (*Peoples*); see also *People v. Lucas* (1995) 12 Cal.4th 415, 473.) "Closing argument may be vigorous" and even "may include opprobrious epithets when they are reasonably warranted by the evidence." (*People v. Sandoval* (1992) 4 Cal.4th 155, 180.) Prosecutors also are allowed to " ' "make fair comment upon" ' " the testimony and other evidence, " ' "including reasonable inferences or deductions" ' " that may be drawn from that evidence. (*Peoples*, at p. 796.) And prosecutors may refer to matters not in evidence, but which are common knowledge or are illustrations "drawn from common experience, history, or literature." (*People v. Loker* (2008) 44 Cal.4th 691, 742 (*Loker*).)

A prosecutor crosses the line and engages in impermissible misconduct if the prosecutor's conduct "infects the trial with such unfairness as to make the conviction a denial of due process." (*People v. Morales* (2001) 25 Cal.4th 34, 44.) In addition, even if a prosecutor's conduct does not render a criminal trial fundamentally unfair, it may constitute misconduct "if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*Ibid*.)

Prejudice must be shown. A conviction will not be reversed based on prosecutorial misconduct "unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct." (*People v. Crew* (2003) 31 Cal.4th 822, 839; see also *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 429.) Where the asserted misconduct claim occurred during closing argument, there must be " 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner' " considering the argument as a whole as well as the instructions. (*People v. Centeno* (2014) 60 Cal.4th

11

659, 667 (*Centeno*).)  In making this determination, courts " ' "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*Ibid*.)  The defendant bears the burden of proving prosecutorial misconduct.  (*People v. Rhinehart* (1973) 9 Cal.3d 139, 154, overruled on other grounds in *People v. Bolton* (1979) 23 Cal.3d 208, 213-214.)

### 2.  *Comments on Porter's Testimony*

During closing argument, the prosecutor compared Porter's testimony to flowers in front of an apartment building covering up exposed plumbing and messy electrical wiring.  He described Porter's testimony at trial as "artfully crafted" to "try and create something pretty to hide an ugly truth," and he asserted that, unlike other witnesses, Porter was self-interested and biased.  Porter contends that, in making these comments, the prosecutor engaged in misconduct by expressing his personal opinion regarding the truth or falsity of testimony and Porter's guilt.  We disagree.

The prosecutor's comments on the credibility of Porter's testimony fall within the " ' "wide latitude" ' " that prosecutors enjoy in closing argument.  (*Peoples*, *supra*, 62 Cal.4th at p. 796.)  It is well-established that a prosecutor may point out potential bias and " ' "argue, from the evidence, that a witness's testimony is unbelievable, unsound, or even a patent 'lie.' " ' " (*People v. Lamb* (2024) 16 Cal.5th 400, 436.)  Here, the prosecutor did just that:  He pointed out Porter's self-interest in being acquitted as well as the inconsistencies between Porter's statements to police on the night of the incident and his testimony at trial, which was the focus of extensive cross-examination.  The prosecutor's comments on these inconsistencies—including his accusations that Porter was self-interested and therefore lying—were proper because they " 'did not mischaracterize or assume facts not in evidence, but merely commented on the evidence and made permissible inferences.' " (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 787; see also *People v. Armstrong* (2019) 6 Cal.5th 735, 797 ["[a] prosecutor may honestly urge that a defendant lied."]; *People v. Ward* (2005) 36 Cal.4th

186, 216 [finding no misconduct in prosecutor commenting on the "relative quality and strength" of a witness' testimony]; *People v. Jasso* (2012) 211 Cal.App.4th 1354, 1369 [prosecutor's characterization of defense as " 'self-serving, incredible, unreliable, unbelievable statement' " was not misconduct].) Moreover, the prosecutor did not improperly vouch for his witnesses by "singing the praises" of the bartender. He simply, and permissibly, observed that the witnesses lacked bias and were credible. (See *People v. Leonard* (2007) 40 Cal.4th 1370, 1407 (*Leonard*).)

Porter also has failed to demonstrate a reasonable likelihood that the jury understood or applied the prosecutor's comments improperly. The trial court instructed the jury that "[y]ou alone must judge the credibility or believability of the witnesses." In light of this instruction, the jury likely understood the prosecutor's comments about Porter's bias and the reliability of other witnesses' testimony as pointing out Porter's failure to rebut the prosecution's evidence, not as usurping the role of the jury. (See, e.g., *Leonard*, *supra*, 40 Cal.4th at pp. 1407-1408; see also *Centeno*, *supra*, 60 Cal.4th at p. 667 [" 'we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statement.' "].)

We therefore conclude that the prosecutor's comments concerning Porter's testimony did not constitute prosecutorial misconduct.

### 3. *Facts Not In Evidence*

Porter also challenges the prosecutor's comparison of Porter's bamboo pole to a baseball bat on several grounds. These challenges have been forfeited and, in any event, are unavailing.

During closing argument, the prosecutor asserted that, while Porter's bamboo pole was "not that heavy," "a baseball bat is not very heavy either, and you can do a lot with a baseball bat." A bamboo pole, the prosecutor continued, is "capable of inflicting great bodily injury, whether you thrust it into someone or whether you crack them over the head with it and split their head open."

13

Porter objects that the prosecutor's observation concerning the weight of baseball bats improperly introduced a fact not in evidence. This objection has been forfeited because at trial Porter did not raise any objection to the prosecutor's observation concerning bats. "As a general rule, ' "[a] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion, and on the same ground, the defendant objected to the action and also requested that the jury be admonished to disregard the perceived impropriety." ' " (*Centeno*, *supra*, 60 Cal.4th at p. 674.) Porter's objection also fails on the merits. The general size, weight, and usage of a baseball bat are common knowledge, and prosecutors are permitted to make "comments drawn from common experience, history, or literature." (*Loker*, *supra*, 44 Cal.4th at p. 742.) Porter also asserts that the prosecutor's argument "evok[ed] disturbing images of baseball bats being wielded" by mobs but fails to offer any explanation for this argument. Accordingly, this argument has not been property raised. (See, e.g., *Osgood v. London* (2005) 127 Cal.App.4th 425, 435 (*Osgood*) ["conclus[o]ry assertions are wholly inadequate to tender a basis for relief on appeal"].)

Porter also objects that the prosecutor misrepresented the evidence, which he contends showed that Porter thrust the bamboo pole into Ramirez rather than cracking it over Ramirez's head. Here again, Porter's objection has been waived because he did not raise it in the trial court. In addition, as discussed above, the prosecutor's contention that Porter hit Ramirez on the head is supported by substantial evidence: Although the video footage supports Porter's contention that he did not hit Ramirez on the head, the footage is unclear, and two eyewitnesses testified that Porter hit Ramirez on the head.

We conclude that the prosecutor's comments concerning baseball bats did not constitute prosecutorial misconduct.

### 4. *Disparaging Defense Counsel*

At several points in his opening brief, Porter asserts that the prosecutor engaged in misconduct by disparaging defense counsel. However, other than noting that at one point

14

the prosecutor made a "snarky remark," Porter does not explain this assertion. As a consequence, this argument has not been properly raised. (*Osgood*, *supra*, 127 Cal.App.4th at p. 435.)

### C. Cumulative Error

Finally, Porter contends that his conviction should be reversed based on the cumulative prejudice from the errors he asserts. This argument fails because there was no error and, thus, no prejudice to cumulate. (See, e.g., *People v. Ortiz* (2023) 96 Cal.App.5th 768, 816.)

### III. DISPOSITION

The judgment is affirmed.

_____
BROMBERG, J.

WE CONCUR:


_____
GREENWOOD, P. J.


_____
DANNER, J.


*People v. Porter*
H051984